THE STATE OF OHIO, APPELLEE, v.
HASSEY, APPELLANT.

(No. 82AP-12—Decided
February 8, 1983.)

Mr. Michael Miller, prosecuting attorney, and Mr. Patrick D. Maguire, for appellee.

Messrs. Varhus & Romanello and Mr. Michael Romanello, for appellant.

MOYER, J. This case is before us on defendant-appellant's appeal from a judgment of the Court of Common Pleas of Franklin County finding defendant, James M. Hassey, guilty of one count of aggravated trafficking (R.C. 2925.03) and one count of drug abuse (R.C. 2925.11).

On November 18, 1980, Sergeant Cherubini of the Columbus Police Department's Narcotics Unit was stationed at the Columbus airport. As defendant disembarked from a nonstop flight arriving from Ft. Lauderdale, Florida, Cherubini recognized defendant both from pictures the sergeant had seen at the police department and because the sergeant had arranged a controlled buy of cocaine from defendant approximately twenty-one months earlier. Cherubini moved to the far end of the terminal to avoid meeting defendant. However, defendant saw the sergeant and approached him, saying, "Don't I know you?" When the sergeant replied affirmatively, defendant asked the sergeant what his name was. The sergeant answered, "Cherubini," and defendant asked, "Don't you work narcotics?" After the sergeant acknowledged that he was with the narcotics unit, he informed defendant that he was waiting for someone coming in on a flight from Atlanta. Cherubini then asked defendant where he was coming from and defendant replied that he had been in Ft. Lauderdale for three days visiting friends.

After defendant moved away, the sergeant pointed defendant out to Officer Porterfield, another narcotics officer who was stationed at the airport, and told Porterfield that defendant's name was James Hassey, that Cherubini had previously made a buy from him, and that Porterfield should keep defendant under observation.

Porterfield had observed the passengers arriving on defendant's flight and, although he remembered seeing defendant walk off the plane, Porterfield had not put defendant under surveillance at that time because, according to Porterfield, defendant had not done anything atypical and he exhibited only one characteristic of the drug courier profile.

Drug courier profiles, which are widely used and accepted by both the federal Drug Enforcement Administration and by local narcotics units, are intended to aid officers in spotting persons carrying illegal drugs (drug couriers) as they arrive in an airport. The drug courier profile used by the Narcotics Unit of the Columbus Police Department consists of the following nine characteristics: (1) arriving from a city or state which is considered a source of narcotics; (2) being one of the first or last five passengers to deplane; (3) looking around, surveying the terminal, or exhibiting signs of extreme nervousness; (4) arriving from a resort area without a tan; (5) carrying little or no luggage; (6) purchasing an airplane ticket with cash; (7) purchasing a ticket using a false name or call back number; (8) making a phone call immediately upon reaching the terminal (especially if a suspicious conversation is overheard by the narcotics agent); and (9) having prior drug arrests.

Cherubini testified that defendant exhibited four of the nine characteristics when he arrived in Columbus. Defendant was coming from a source city (Ft. Lauderdale), he was one of the first five passengers to disembark, he was nervous and looked around, and Cherubini knew defendant had previously been involved in a narcotics investigation.

Porterfield, who was assigned to observe passengers disembarking from defendant's flight, testified that defendant was between the tenth and twentieth person out of about forty passengers to leave the plane and that the only characteristic he observed when defendant entered the terminal was that defendant was arriving from a source city. Porterfield noticed nothing atypical about defendant until after Cherubini warned Porterfield to keep defendant under observation. Following his conversation with Cherubini, Porterfield gave greater significance to the following traits: defendant had no tan; defendant appeared nervous after defendant's conversation with Cherubini; he kept looking over his shoulder; he had prior narcotics involvement; he claimed only one suitcase (which Porterfield admitted was about average for a three-day vacation); and, after defendant claimed his suitcase, he abandoned it in the middle of the baggage claim area while he visited the restroom.

When defendant emerged from the restroom, he picked up his suitcase and headed for the exit, looking over his shoulder as he went. After defendant stopped near the exit and set his bag down, Porterfield approached defendant, showed his badge, and said: " 'Excuse me, Mr. Hassey, could I speak to you for a moment? * * * I'm Detective Porterfield from the Columbus Police Narcotics Bureau.' " Porterfield also told defendant that he understood defendant had been involved in a narcotics investigation. Defendant denied this allegation. Porterfield then asked to see defendant's plane ticket and defendant told him he had left it on the airplane. Since Porterfield considered this to be another profile characteristic, he asked defendant how long he had been in Florida. When defendant said he had just flown down yesterday and was flying back that day, Porterfield told defendant that there was a major problem with narcotics coming in from Florida and asked for consent to check defendant's bag.

Defendant agreed to consent to a search and Porterfield asked him to step into a nearby hallway to get out of the flow of traffic. Apparently the hallway was marked "Employees Only" or "Authorized Personnel Only." Once they entered the hallway, Porterfield for the

second time asked for and received defendant's consent to search, but the officer did not advise defendant that he had a right to refuse to consent to a search of his bag. Porterfield and another officer opened defendant's suitcase and discovered some pills which defendant identified as 714's (methaqualones). The officers then asked for consent to open defendant's shaving kit. Defendant replied, "go ahead." Inside the shaving kit, the officers discovered a plastic bag showing traces of a white powder which defendant identified as cocaine when he was asked what had been in the bag.

The officers then asked if defendant would mind if they checked his clothing. In the left-rear pocket of defendant's pants, the officers found an eyeglass case with a bag of white powder sticking out of it. The officers removed this bag from defendant's pocket, then informed defendant that he was under arrest.

After the trial court denied defendant's motion to suppress the evidence seized by the officers, defendant changed his not guilty plea to a plea of no contest, and the trial court found him guilty of the crimes charged in the indictment.

Defendant has raised the following assignment of error in support of his appeal:

"The trial court erred to the prejudice of appellant in overruling appellant's motion to suppress the evidence in this cause for the reason that the evidence seized was obtained in violation of appellant's Fourth and Fourteenth Amendment right[s] to be free from unreasonable searches and seizures."

The first issue to be decided is whether the contact between Porterfield and defendant was a police-citizen contact or a seizure.

The Fourth Amendment to the United States Constitution guarantees every citizen the right to be free from unreasonable searches and seizures. Evidence acquired in violation of the Fourth Amendment pursuant to the controversial exclusionary rule, expounded in *Mapp* v. *Ohio* (1961), 367 U.S. 643, 655 [16 O.O.2d 384], is inadmissible in both the state and federal courts.

The state argues that the Fourth Amendment is not implicated in the present case because defendant was not seized. Alternatively, the state asserts that, if defendant was seized, the seizure did not violate the Fourth Amendment because it was not an unreasonable seizure according to the established law. Thus, the state claims that the trial court did not err where it overruled defendant's motion to suppress.

The prosecutor argues that the contact was merely a police-citizen contact which, unlike a seizure, need not be supported by either a reasonable suspicion or by probable cause.

Although the limitations imposed by the Fourth Amendment apply to the investigatory stage of a criminal prosecution (*Davis* v. *Mississippi* [1969], 394 U.S. 721, 726-727), the amendment prohibits only unreasonable searches and *seizures*. Thus, if no seizure occurred, the Fourth Amendment cannot have been violated. We will, therefore, consider that issue first.

The United States Supreme Court has recognized that:

"* * * [N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." [*Terry* v. *Ohio* (1968), 392 U.S. 1, 19, fn. 16 (44 O.O 2d 383).]

The generally accepted test for determining whether there has been a seizure is whether, in the circumstances presented, a reasonable person would have believed he or she was free to leave. *United States* v. *Mendenhall* (1980), 446 U.S. 544, 554. As the Fifth Circuit Court of Appeals has stated, if a suspect retains his freedom to choose whether to remain

and answer questions or to ignore the officer and proceed on his way, the courts usually will not find that the officer's conduct amounted to a seizure. *United States v. Elmore* (C.A. 5, 1979), 595 F.2d 1036, 1041-1042. See, also, *Michigan v. Summers* (1981), 452 U.S. 692; *United States v. Pope* (C.A. 6, 1977), 561 F. 2d 663, 668. Furthermore, a seizure usually occurs only when a suspect's freedom of movement is restrained "by means of physical force or a show of authority." *Mendenhall, supra,* at 553.

Officers have the right to ask questions even when they do not have the right to compel persons to answer. *Davis v. Mississippi, supra,* at 727, fn. 6. In the present case, Porterfield approached defendant after defendant stopped near an airport exit. The officer did not chase after defendant or order him to stop. The officer was not accompanied by other officers nor was he wearing a police uniform or displaying a gun. Defendant was not physically restrained or touched and the officer did not block defendant's path or tell him that he was not free to leave. Although the test for a seizure is objective and does not depend upon either the officer's or the defendant's subjective appraisal of the situation, Porterfield repeatedly testified that defendant was free to walk away until officers discovered the cocaine in defendant's back pocket. In several cases where courts have determined that the defendant was not free to leave and had been seized, the officers testified that, had the defendant attempted to leave, they would have detained him. *E.g., United States v. Jefferson* (C.A. 6, 1981), 650 F.2d 854, 858. Porterfield's testimony, while it is by no means conclusive, supports the trial court's finding that defendant had no ob-

jective reason to believe that he was not free to leave.

The state argues, and we agree, that defendant was not seized; he retained his freedom to walk away when Porterfield approached him. We denominate this approach a mere "police-citizen contact" which, being even less intrusive than an investigatory stop which amounts to a seizure of a defendant's person, does not implicate the Fourth Amendment.

Were we to hold that Porterfield had indeed stopped defendant and restrained his freedom to walk away, we would still agree with the state and hold that defendant's Fourth Amendment rights have not been violated.

It is well-established that some stops which are less intrusive than a traditional arrest but during which the suspect is not free to leave are, in fact, seizures which implicate the Fourth Amendment. *Brown v. Texas* (1979), 443 U.S. 47, 50; *Terry v. Ohio, supra,* at 16-20. And, although a police officer must have probable cause (*Beck v. Ohio* [1964], 379 U.S. 89, 91 [31 O.O.2d 80]) before making a seizure which is the equivalent of a formal arrest, police officers can make a less intrusive seizure, *i.e.,* a stop, with less than probable cause. *United States v. Brignoni-Ponce* (1975), 422 U.S. 873, 880-881; *Terry v. Ohio, supra,* at 24.[1]

When a police officer has a well-founded suspicion that the suspect is engaged in criminal activity, the officer need not "shrug his shoulders and allow a * * * criminal to escape." *Adams v. Williams, supra,* at 145. In fact, it may be a failure of the officer's duty not to investigate further. *Terry v. Ohio, supra,* at 23; *United States v. Elmore, supra,* at 1039. To aid the police in their investigatory duties, the United States

---

[1] Although this authority to stop was originally recognized in the context of a stop and frisk for weapons, the courts have expanded *Terry* by separating the stop from the frisk and have validated the stop for investigation on less than probable cause. See *Brown v. Texas, supra,* at 51; *United States v. Brignoni-Ponce, supra,* at 880-881; *Adams v. Williams* (1972), 407 U.S. 143, 145-146; *United States v. Smith* (C.A. 6, 1978), 574 F.2d 882, 885-886.

Supreme Court has adopted what they have termed an "intermediate response." *Adams* v. *Williams, supra,* at 145-146. This response fills the gap between the police-citizen contact where the officer asks questions which the suspect, who is free to leave, answers voluntarily, and the traditional arrest requiring probable cause.

Determining whether the less intrusive stop complies with the Fourth Amendment's requirement that searches and seizures be reasonable involves balancing the need to stop suspects and the public interest in the investigation and prevention of crime against the intrusion the stop entails. *Delaware* v. *Prouse* (1979), 440 U.S. 648, 654; *Terry* v. *Ohio, supra,* at 21, citing *Camara* v. *Municipal Court* (1967), 387 U.S. 523, 534-535. The government has a substantial interest in stopping the flow of illegal narcotics and a need to search before drug couriers leave the area. Indeed, most reasonable citizens would agree that stopping the flow of illegal drugs into their community is or should be a high priority of any law enforcement agency. Yet the intrusion on defendant is minimal — he is merely approached and asked whether he will answer a few questions. He is not detained for a long period of time at the police station. In this context, the balancing test favors the stop.

However, to satisfy the Fourth Amendment's requirement that all seizures must be reasonable, these intermediate investigatory stops must be supported by "a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid* v. *Georgia* (1980), 448 U.S. 438, 440. Numerous courts have held, and we agree, that the fact that a suspect fits several of the characteristics contained in the drug courier profile does not, without indication of illegal conduct, necessarily provide the officers with the reasonable and articulable suspicion required to effectuate an investigatory stop. *E.g., Reid* v. *Georgia, supra,* at 441.

The characteristics of the drug courier profile alone are insufficient grounds for stopping a suspect partly because many innocent travelers also display profile characteristics when they arrive in an airport. *Reid* v. *Georgia, supra,* at 441; *United States* v. *McCaleb* (C.A. 6, 1977), 552 F. 2d 717, 720. Cherubini testified that he and his agents feel that they are justified in "interviewing" a traveler who fits three or four of the profile characteristics. Many travelers would easily fit four characteristics by arriving from a source city or state such as Florida, Texas, California, New York, or Atlanta; being one of the first or last passengers to deplane; making a telephone call to arrange transportation; and looking nervously around a strange airport. In fact, Cherubini testified that the Columbus Police Department probably stops sixteen suspected drug couriers a month at the Columbus airport based on the profile characteristics but that not all of these people are arrested. To allow the police to stop travelers merely because they display any three or four of the profile characteristics would be to sanction "virtually random seizures" of all air travelers. See *Reid* v. *Georgia, supra,* at 441.

Thus we agree with the Sixth Circuit Court of Appeals that the police must rely on additional factors to provide the reasonable suspicion required to make a valid stop. *United States* v. *Pope, supra,* at 667. See, also, *United States* v. *Smith, supra,* at 884 (additional factor was abdominal bulge); *United States* v. *McCaleb, supra* (no additional factor; stop invalid). In the present case, the only additional factor relied on by Porterfield was the fact that defendant behaved very strangely when he abandoned his suitcase in the middle of the terminal when he went to the restroom. This alone would not provide the officers with a reasonable suspicion that defendant was engaged in

criminal activity, but the strange behavior viewed together with the fact that defendant was extremely nervous during his conversation with Cherubini and appeared to be relieved that the sergeant was there to meet a different plane and the fact that defendant had arrived from a source city in Florida with only one suitcase and no tan and that defendant had known prior involvement with narcotics, provided the officers with the requisite reasonable suspicion to stop defendant to investigate. Although none of the individual facts was independently sufficient to provide a reasonable suspicion, the combination of these facts was sufficient to justify the trained and experienced police officers' investigatory stop of defendant. See *United States* v. *Brignoni-Ponce, supra,* at 884-885; *Terry* v. *Ohio, supra,* at 22-23; *United States* v. *Prince* (C.A. 6, 1977), 548 F.2d 164, 166.

The facts that defendant left his ticket on the airplane and told conflicting stories about his trip to Florida are irrelevant since Porterfield learned of them after he stopped defendant. Facts acquired after a stop cannot provide justification for the stop.

Thus we conclude that Porterfield's initial approach to defendant was a mere police-citizen contact which did not even constitute a seizure and, therefore, does not implicate the Fourth Amendment and that, even if defendant was stopped for investigation based in part upon the drug courier profile, this minimally intrusive seizure did not offend the Fourth Amendment since it was supported by a reasonable suspicion based on specific and articulated facts.

Although the approach was valid, our reasoning thus far is not enough to justify the search of defendant and his luggage. The state has argued, the trial court decided, and we agree, that defendant consented to the searches.

In the leading case regarding consent searches, the United States Supreme Court held that, although searches usually violate the Fourth Amendment when they are conducted without a warrant and without probable cause, the exception to the general rule is the consent search. *Schneckloth* v. *Bustamonte* (1973), 412 U.S. 218, 219. To validate the search, however, the state must prove that the consent was freely and voluntarily given. *Bumper* v. *North Carolina* (1968), 391 U.S. 543, 548.

Whether a defendant's consent is voluntary "* * * is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent. * * *" *Schneckloth* v. *Bustamonte, supra,* at 227.

Although the record implies that Columbus narcotics officers generally inform suspected drug couriers of their right to refuse consent to a search, in this case defendant was not so informed. This fact does not conclusively demonstrate that defendant's consent was involuntary. Defendant was thirty-two years old and had attended college for three years. There is no indication in the record that defendant was not of at least average intelligence. Porterfield approached defendant and asked defendant in a conversational tone of voice whether he could speak to defendant. The officer was dressed in street clothes and did not have his gun drawn. Defendant agreed to talk with the officer, to move to a nearby hallway, and to open his bag. Defendant not only agreed to allow the officer to search his luggage, his shaving kit, and his person, but defendant assisted the officers by identifying the narcotics they discovered. The only show of force occurred when the officers approached defendant and identified themselves. This is insufficient to show that defendant consented in submission to a claim of lawful authority. See *Bumper* v. *North Carolina, supra,* at 548-549 (consent given in submission to claim of lawful authority not

voluntary) and *United States* v. *Elmore, supra,* at 1042 (approach by officers insufficient show of force to constitute seizure).

As the Court of Appeals for Athens County stated:

"* * * [D]efendant agreed to the search without a word of complaint or objection and in a setting which is not to be equaled with the aura of oppressiveness which oft pervades the precincts of a police station. The trial court held the physical evidence to be admissible, and we cannot say it erred in so doing." (*State* v. *Wingerd* [1974], 40 Ohio App. 2d 236, 238 [69 O.O.2d 217]. )

Since the trial court's finding the defendant consented to all stages of the search is not clearly erroneous and since we agree that the initial approach of defendant was constitutionally permissible, defendant's assignment of error is overruled.

For the foregoing reasons, the judgment of the trial court is affirmed.

*Judgment affirmed.*

REILLY and McCORMAC, JJ., concur.