[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 484 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 485 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 486 
 JOURNAL ENTRY AND OPINION
This is an appeal from an order of Judge Nancy Margaret Russo denying appellant Ranford Washington's motion to suppress and an appeal from his no contest plea to drug charges involving over 20,000 grams (about forty-four pounds) of marijuana. Washington claims that the initial stop was motivated by race, and that he and his luggage were illegally stopped and searched at the Cleveland Amtrak station. The State contends that Washington consented to be questioned and that he validly consented to the search of his luggage during that questioning. We reverse the order denying the motion to suppress, vacate the conviction and remand.
Our understanding of the facts is derived from the suppression hearing on November 17, 1999. On July 29, 1999, four officers affiliated with the United States Drug Enforcement Agency (DEA) went to Cleveland's Amtrak train station to investigate a report that four suspected drug couriers would be arriving on the No. 49 train from New York City. The agents believed they were looking for one female suspect and three male suspects, although they were unsure of even this because they were given only the suspects' names. The agents had no physical description of the suspects whatsoever, and no information concerning the bases of the tips.[1] The train was scheduled to arrive at 4:57 a.m., but was over an hour late and finally arrived at 6:10 a.m.
Although four DEA agents reportedly were present at the train station on the morning in question, only two testified: Charles Stirling and James Gilchrist, the agents who stopped Washington for questioning and ultimately searched his luggage and arrested him. Upon being alerted by two other agents that Washington was one of the last people to leave the train and was carrying new luggage, Stirling and Gilchrist approached him as one of the suspected couriers. Stirling stopped Washington for questioning and asked for his identification and ticket, which Washington provided. The ticket was in the name of Eugene Brown, one of the names reported to be that of a suspected drug courier, and the *Page 487 
Connecticut identification card he produced stated his name to be Eugene Thamis.
Stirling testified that he requested permission to search Washington's luggage, but Washington stated that he wasn't sure he wanted them to do so. Washington asked Stirling why he was being stopped, and Stirling testified, I just explained to him that this was what we do, this was our job. Gilchrist then took over the questioning, and asked Washington, who had a Jamaican accent, questions about his trip itinerary and his immigration status. After Washington told the agents that he was a Jamaican citizen who had lived in the United States for twenty years, Gilchrist stated that he asked for additional identification, such as Washington's green card, but Washington (who at that time continued to represent himself as Eugene Thamis) stated that he had no other identification.
Gilchrist testified that he asked Washington more questions about his luggage, such as whether he had something that he didn't want the agents to see. Gilchrist next testified, I explained if he would allow us to look in his luggage, it would be a brief encounter. According to Gilchrist, Washington then opened his suitcase and allowed the agents to view the contents, and the marijuana was discovered. Gilchrist further testified that Washington was free to ignore the agents' questions and leave at any time, although had he refused to consent to the search, based on what we knew up to that point, we would have at least detained the bag for at least a dog inspection. Although the agents did not tell Washington he was free to go at any time, both stated that they never physically touched him, nor did they draw their weapons, and they did not tell him that he was not free to leave.
Washington denied giving consent to the search, and stated that the agents simply took his bag from him and searched it while interrogating him concerning his immigration status. The judge denied Washington's motion to suppress, and issued written findings and conclusions in support of her decision including, inter alia, the following:
 1) that the encounter between the agents and Washington was at all times consensual;
 2) that Washington, who was free to leave at any time, freely and voluntarily consented to the search of his bag; and
 3) that the initial stop of Washington was justified because he was a suspected drug courier, based on the information provided and courier profiling characteristics, and that racial profiling therefore was not a factor in the initial stop, because Washington was stopped because he fit race-neutral courier characteristics. *Page 488 
Washington thereafter entered a no contest plea to possession of more than 20,000 grams of marijuana, a second degree felony punishable by a mandatory maximum prison term of eight years, R.C. 2925.11(C)(3)(f), and preparation of drugs for sale, a fourth degree felony. R.C.2925.07(C)(3)(c). On December 7, 1999, he was sentenced to, inter alia, the mandatory eight-year term on count one, and to a consecutive twelve month prison term on count two. Washington filed a notice of appeal on January 7, 2000, which this court dismissed as untimely on August 9, 2000. Washington then requested leave to file a delayed appeal, which this court granted on August 16, 2000.
Washington asserts a single assignment of error:
 THE COURT ERRED WHEN SHE DENIED DEFENDANT'S MOTION TO SUPPRESS.
When reviewing a warrantless search, this court will reverse findings of historical fact only upon clear error, but makes a de novo determination when applying those facts to the law; whether a search was reasonable upon particular facts is a legal question, Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); State v. Harris (1994), 98 Ohio App.3d 543, 546, and the State has the burden to prove the intrusion reasonable. City of Xenia v. Wallace (1988),37 Ohio St.3d 216, 524 N.E.2d 889.
Because the State claims that the questioning of Washington was at all times consensual, culminating in his free and voluntary consent to the search of his luggage, it has the burden of proving that consent was freely and voluntarily given, as shown by the totality of the circumstances. Florida v. Royer (1983), 460 U.S. 491, 497,103 S.Ct. 1319, 1323-24, 75 L.Ed.2d 229; Schneckloth v. Bustamonte (1973),412 U.S. 218, 248-49, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854, 875. Washington claims any consent is invalid because it was obtained as the product of an unlawful seizure. Although an individual may still give consent after being illegally detained, State v. Robinette (1997),80 Ohio St.3d 234, 241, 685 N.E.2d 762, 769, any unlawful detention weighs heavily in determining whether consent was free and voluntary, or a submission to a show of authority. In fact, the Robinette court held:
 Once an individual has been unlawfully detained by law enforcement, for his or her consent to be considered an independent act of free will, the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave. Id., paragraph three of the syllabus.
Not only does Robinette raise the level of proof necessary where purported consent follows an illegal detention (must clearly demonstrate), the State must prove that a reasonable person would have understood that the detention was unlawful before validating the consent (reasonable person would believe that he *Page 489 
or she * * * could in fact leave.). We do not believe Robinette intended to state a rule of law any different from United States Supreme Court cases recognizing that consent obtained as the product of illegal detention cannot be voluntary. See Royer, 460 U.S. at 501,103 S.Ct. at 1326 (investigatory detention amounting to an illegal arrest nullifies purported consent). Indeed, if taken literally, Robinette's syllabus requires the illegally detained individual to recognize that the detention is not only unlawful, but also somehow nonexistent, as he or she remains free to leave despite the detention, lawful or otherwise. While this factual scenario might be satisfied in an extraordinary case, we believe most reasonable people would believe detention restricts their ability to leave the scene regardless of whether authorized, and that illegal detention will vitiate consent in nearly all cases.
Washington also raises a claim of racial profiling, arguing that the DEA agents targeted him for initial questioning because of his race. Although the agents' request for an initial consensual encounter is not protected by constitutional guarantees against unlawful search and seizure, equal protection guarantees do safeguard individuals from wrongful discrimination based on their race. United States v. Avery (C.A.6, 1997), 137 F.3d 343, 352-53. Washington has to prove that he was intentionally targeted for questioning because of his race, although he may do so by presenting evidence of disparate impact. Id. at 355-56.
We begin our analysis with the judge's factual findings. Despite Washington's denials, the essential factual findings are not clearly erroneous. The judge found that Washington was approached for questioning by Stirling and Gilchrist, that he produced a train ticket and identification bearing different names, that he initially declined a request to search his bag, and that he ultimately opened the bag for inspection after further questioning. The judge also found that the agents did not physically restrain Washington and did not draw their guns prior to the opening of the bag. We see no reason to disturb these findings, but based upon other facts in the record, we cannot agree with the conclusion that Washington's encounter with the agents was at all times consensual, that his consent to the search of his luggage was freely and voluntarily given and that he was never seized for Fourth Amendment purposes.
A seizure occurs when an objectively reasonable person would believe, under the circumstances, that he is not free to ignore a governmental presence and go about his business. Florida v. Bostick (1991), 501 U.S. 429,434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389; Michigan v. Chesternut (1988), 486 U.S. 567, 576, 108 S.Ct. 1975, 1981, 100 L.Ed.2d 565, 573. It does not require physical restraint or a show of force, but an objective show of authority and surrender. Bostick. Therefore, although the lack of physical restraint or drawn guns is relevant to whether Washington was seized, it is not dispositive. Just as notions *Page 490 
of reasonable suspicion and probable cause must be assessed on the peculiar facts presented in each case, so are questions of police coercion and voluntariness. Robinette, 80 Ohio St.3d at 243-44; see, also, Bostick, 501 U.S. at 437, 111 S.Ct. at 2387-88 (remanding for determination of whether seizure occurred). Simply because Washington was not removed to an isolated location, as in Royer, 460 U.S. at 494,103 S.Ct. at 1322, and the agents made no overt show of force, does not prove that coercive tactics were not used.
Stirling testified that when first approached, Washington asked why he was being stopped, and Stirling responded by telling him he was doing his job. While we can accept the fact that the agents never directly told Washington that he was not free to leave, it is obvious they never communicated, expressly or otherwise, that he was free to ignore their questions and go about his business. When Washington asked why he was being detained, the agents certainly should have sensed his reluctance to engage in a consensual encounter and his feeling of coercion, yet they neither relented in their questioning nor explained to Washington his right to ignore them.
Washington's understanding of his freedom would necessarily lessen as the encounter continued and the questioning escalated, and by the time agent Gilchrist approached him and asked further questions concerning his luggage and his immigration status, Washington reasonably could have believed that he was not free to go until the agents so indicated. Even when questioning begins as a consensual encounter, there must be a point at which the individual being questioned reasonably understands that the government is in control, and that he is not free to leave until so informed. Therefore, although we agree that government agents need not expressly inform individuals of their right to ignore questioning at the beginning of an encounter, we will consider the length and character of any encounter in assessing whether a reasonable person would understand that he was not free to leave until satisfying the agents' purposes. Gilchrist asked Washington questions about his identity, nationality, and immigration status, and Washington did not produce his green card as requested. Under these circumstances, Washington would not reasonably believe he could unilaterally end the encounter or consider himself free to leave until so informed.
Finally, Gilchrist testified, I explained if he would allow us to look in his luggage, it would be a brief encounter. Regardless of any other argument concerning the existence or timing of the seizure, neither Washington nor any other reasonable person could understand this statement as anything other than a detention. The import of the statement is that Washington would be subjected to a lengthy encounter if he did not consent to the search and anyone hearing this statement would reasonably believe that, at least at that point, he was no longer free to leave. *Page 491 
We assess whether a reasonable person would have felt free to terminate the encounter by postulating an innocent suspect. Bostick,501 U.S. at 438, 111 S.Ct. at 2388. Under the circumstances, an innocent person in Washington's position first would not have believed himself free to go while being questioned concerning his immigration status; moreover, after being told that the encounter would be brief if he consented to the search, a reasonable innocent person in Washington's position would have understood that he was not free to go unless and until he consented to the search.
Because we have determined that Washington was seized prior to the search, we must next determine whether he was reasonably seized. As already noted, consent to search is invalid if it is the product of an illegal seizure. If the seizure is properly supported, however, valid consent can still be given. Royer, 460 U.S. at 501, 103 S.Ct. at 1326. Because we agree that Washington was not arrested until after his bag was searched, the initial detention need not be supported by probable cause, but is instead governed by the reasonable suspicion standard of Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Under Terry, a government agent may stop an individual and detain him for a short period of time if he has a reasonable, articulable suspicion that criminal activity is occurring or imminent. Id. at 21, 88 S.Ct. at 1880,20 L.Ed.2d at 906.
Agents Stirling and Gilchrist were watching people depart from a train in hopes of identifying suspected drug couriers identified to them by name only. They, in turn, did not even see Washington engage in any allegedly suspicious behavior but had been alerted by two other agents that Washington was one of the last people to leave the train, and that his luggage was new. At this point there can be no doubt that the agents did not have reasonable suspicion to justify a seizure.
When Stirling approached Washington and asked for his identification, Washington produced a ticket stub and an identification card with different names. The name on the ticket was Eugene Brown, a name the agents had been alerted to as belonging to one of the suspected couriers. The agents also testified that Washington appeared nervous while being questioned, because his hands were shaking and he stammered.[2] The seizure must be justified from these essential facts.[3] *Page 492 
Washington was suspected of possessing drugs because he allegedly fit the characteristics of a drug courier profile used by the agents. Behavior and appearance consistent with these characteristics might allow agents to conduct further investigation or seek consensual questioning, but does not provide the reasonable suspicion necessary to justify a seizure. State v. Hassey (1983), 9 Ohio App.3d 231, 235, 459 N.E.2d 573,579. Because the generality of such characteristics can implicate perfectly innocent behavior, a suspect must exhibit some specific and significant suspicious conduct before any seizure is justified. Id.; Reid v. Georgia(1980), 448 U.S. 438, 441, 100 S.Ct. 2752, 2754,65 L.Ed.2d 890, 894.
When the agents first approached Washington, they knew that he was a passenger getting off a train at 6:10 a.m., he was coming from New York, he was carrying new luggage and, according to other agents, was one of the last to leave the train. Even when considered in totality, these characteristics are trivial. Reid, supra. Washington's only conduct was allegedly being one of the last people to get off the train, and appearing nervous when approached by the agents. Stirling testified that he did not know how many people got off the train that morning, but that he had attended other early-morning train arrivals, and that eight to twenty-five people normally arrive on such trains. Washington, therefore, would stand a good chance of being one of the last people off the train simply because of the small number of people involved. Furthermore, Washington's alleged nervousness is only slightly probative of any wrongdoing; perfectly innocent people become nervous when approached by law enforcement agents, and Washington's conduct was not shown to be unreasonable.
The State did not present any evidence concerning the information that led the officers to suspect the person named Eugene Brown as a drug courier. Therefore we cannot attribute reasonable suspicion to the fact that Washington's ticket bore this name. There was no evidence of the basis of the information or the informant's reliability.[4]
Furthermore, because the remaining circumstances provided only minuscule support for any suspicion, the fact that Washington's ticket did not match the name on his identification was inadequate as the particularized reason necessary, in addition to objective profile characteristics, for detaining him on suspicion of being a drug courier. United States v. $53,082.00 in United States Currency (C.A.6, 1993), 985 F.2d 245, 250.
Traveling under an assumed name does raise generalized suspicions, but even with this revelation the agents had too little information to reasonably suspect *Page 493 
Washington of being a drug courier, because without more the conduct can be as indicative of other behavior, such as marital infidelity, as it is with drug smuggling. Because Washington's nexus with profile characteristics was vague, weak, and generalized, there was an insufficient foundation to infer that his use of an alias suggested drug smuggling instead of some other innocent, or at least non-criminal, purpose. If we were to approve the seizure here we would be sanctioning virtually random seizures of individuals, supported by only the most general justifications in order to mask their arbitrary (or worse, discriminatory) nature. Reid, 448 U.S. at 441, 100 S.Ct. at 2754,65 L.Ed.2d at 894; Hassey, 9 Ohio App.3d at 235, 459 N.E.2d at 579. We find that Washington was unlawfully seized, and that any consent to search his bags after that seizure was invalid as a product of that seizure.
We also find that, under the totality of the circumstances, Washington's consent was not freely and voluntarily given even if his seizure had been valid. Gilchrist plainly informed him that the encounter would not end unless and until he consented to the search of his bag and Washington's response to this statement was a submission to authority, rather than a voluntary invitation to search. Royer, 460 U.S. at 497,103 S.Ct. at 1324. Despite the fact that he was not taken to an isolated room, as was done in Royer, Washington was subject to the agents' coercion as he stood alone outside the Cleveland train station in the early morning, answering pointed questions about his nationality and immigration status. We believe in this case, as in Robinette, that [w]hen these factors are combined with a police officer's superior position of authority, any reasonable person would have felt compelled to submit to the officer's questioning. Robinette, 80 Ohio St.3d at 244-45,685 N.E.2d at 771. Robinette recognizes that police conduct need not be expressly coercive, but can impair an individual's ability to consent freely and voluntarily in various and subtle ways. Id. Therefore, even if we were to find the seizure justified in this case, we would find Washington's consent coerced.
Finally, although we have decided the case on other grounds and Washington failed to present any evidence to prove a claim of racial profiling, we think it prudent to comment briefly upon his allegations. Here, the agents stopped Washington, a black man originally from Jamaica, because they were told by two other agents that he had new luggage and was one of the last people to leave the train. The two agents who were said to have observed Washington leave the train did not testify at the suppression hearing and, therefore, the agents who did testify could not be cross-examined concerning the basis of Washington's stop because they stopped him based on information given to them by others. While the agents' hearsay testimony was admissible in a suppression hearing, its hearsay nature is properly considered when weighing the testimony. Although *Page 494 
Washington did not present evidence to support an equal protection violation, the fact that he was stopped for investigation on such flimsy grounds certainly raises questions concerning the propriety of allowing stops predicated on generalized profiles.
As already noted, the profile characteristics are so general that they can be modified to justify arbitrary or discriminatory targeting of suspects. See, e.g., Hassey, 9 Ohio App.3d at 235, 459 N.E.2d at 579
(arriving from a source city, such as New York, and being one of first or last passengers to leave the train); Reid, supra (early morning arrival with only carry-on luggage); Royer, 460 U.S. at 493 n. 2,103 S.Ct. at 1322 n. 2 (luggage appeared heavy and tag not filled out completely, and suspect looked around nervously); Avery, 137 F.3d at 346 (suspect appeared very focused and looked straight ahead.). The potential abuse of these general and conflicting characteristics should be apparent, as one can fit the profile either by debarking too early or too late, by carrying too much luggage or not enough, by looking around the terminal or by looking straight ahead, and by coming from or arriving at virtually any urban location. Because of the generalized nature of drug courier profiles and the practical reality that a defendant normally will be hard-pressed to meet a burden of showing an equal protection violation, judges should closely scrutinize stops based on such profiles to ensure they are justified on the bases claimed. Where, as here, the initial stop is based on unexplained and tenuous observations, such questions should be included in the totality of circumstances considered.
We reverse the judgment on Washington's motion to suppress, vacate his conviction and remand.
It is ordered that appellant recover from appellee his costs herein taxed.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 _______________________ ANNE L. KILBANE, JUDGE:
DIANE KARPINSKI, P.J., and TIMOTHY E. McMONAGLE, J., CONCUR.
[1] In a brief submitted to the trial judge, the State averred that another, unnamed DEA agent reviews passenger manifests for drug courier characteristics and determined that a person named Eugene Brown bought a one-way ticket from New York City to Cleveland less than an hour before the train's departure, paid for the ticket in cash, and left no call-back telephone number for the reservation. None of these representations is in evidence, however, nor are certain other representations made in the State's briefs to the trial judge.
[2] Washington also apparently stammered when he testified at the suppression hearing, and explained to the judge that he was a stutterer.
[3] We note that the State has not argued that the agents had justification for a reasonable seizure, but has instead argued exclusively that no seizure occurred prior to discovery of the marijuana.
[4] Even if we accepted the representations that the informant was another DEA agent who examined passenger manifests, there was still no evidence concerning how often the informant's tips correctly identified drug couriers. *Page 495