OPINION
On February 25, 2000, defendant, Tiffany M. Rozelle, was charged with one count of possession of marijuana and one count of preparation of marijuana for sale. These two counts charged violations of R.C. 2925.11
and 2925.07, respectively. Defendant entered a no contest plea to the charges set forth in the indictment on November 2, 2000. She was then placed under community control for a period of three years. Defendant now appeals raising the following assignment of error:
 The trial court committed reversible error by overruling a defense motion to suppress the results of a search conducted in violation of the rights afforded by the Fourth and Fourteenth Amendments to the United States Constitution and § 14, Article I of the Ohio Constitution.
The Fourth Amendment to the United States Constitution guarantees every citizen the right to be free in their persons, houses, papers, and effects against unreasonable searches and seizures. Therefore, evidence acquired in violation of the Fourth Amendment is inadmissible in court. See Mapp v. Ohio (1961), 367 U.S. 643. However, not every encounter between a citizen and a law enforcement officer implicatesFourth Amendment protection. United States v. Mendenhall (1980), 446 U.S. 544,552. For example, the Fourth Amendment is not triggered when a law enforcement officer approaches a person in a public place, asks to speak with that individual, and then carries on a consensual dialogue. As a matter of common sense, the Fourth Amendment guarantee is not needed because the individual is under no compulsion to answer the officer's questions, and can, in fact, walk away. See Florida v. Royer (1983),460 U.S. 491, 499. Stated alternatively, a seizure occurs when an objectively reasonable person would believe, under the circumstances, that he or she is not free to unilaterally terminate the encounter. Florida v. Bostick (1991), 501 U.S. 429. That being the case, theFourth Amendment is clearly implicated when a law enforcement officer conducts a traditional arrest. However, it is also implicated when law enforcement officers detain an individual for a short period of time in order to carry out an investigatory stop. See Terry v. Ohio (1968), 392 U.S. 1, and Adams v. Williams (1972), 407 U.S. 143.
In the present case, the state concedes that defendant was seized. However, it argues that the Fourth Amendment was not violated because defendant was seized for the purpose of completing a proper investigatory stop according to Terry and its progeny.
This court has previously recognized that when a police officer has a well-founded suspicion that a suspect is engaged in criminal activity, the officer need not "shrug his shoulders" and allow a criminal to escape. State v. Hassey (1983), 9 Ohio App.3d 231, citing Williams, supra, at 145. In order to aid law enforcement in their investigatory duties, as noted above, the United States Supreme Court has fashioned what is sometimes referred to as an "intermediate response," or "investigatory stop." Id.
In order to satisfy the Fourth Amendment's requirement that all seizures be reasonable, investigatory stops must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity. Reid v. Georgia (1980), 448 U.S. 438, 440. Such a stop is permissible when specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the conclusion that the individual being stopped or detained is engaged in criminal activity. Terry, supra. See, also, United States v. Cortez (1981), 449 U.S. 411.
On November 2, 2000, the trial court conducted a hearing on the defendant's motion to suppress evidence of the thirty-three pounds of marijuana recovered from her luggage. The only facts known of this incident were elicited at the November suppression hearing. Although three agents reportedly were present at the time the defendant was stopped, only one, Columbus Police Detective Harry Fisher, testified.
On December 21, 1999, Detective Harry Fisher was working the DEA Drug Interdiction Task Force at the Port Columbus International Airport. That same day, defendant flew from El Paso, Texas, to St. Louis, Missouri, and then to Columbus, Ohio, on TWA flight 596. Prior to her arrival at the Port Columbus International Airport, information from an unidentified individual was relayed from the St. Louis Airport to the Columbus Task Force.
According to Detective Fisher, an unnamed member of the Columbus Task Force received information that a female traveling from El Paso, Texas, was on her way to Columbus, Ohio. The unnamed source stated that this individual had purchased a one-way ticket with cash. Based upon this information only, Detective Fisher waited at the terminal gate while TWA flight 596 deplaned. He then followed defendant, while two other officers waited for defendant and Detective Fisher at the baggage carousel.
Detective Fisher testified to the remaining events as follows:
Q. * * * You said you met the plane at the gate.
A. That's correct, yes, ma'am.
Q. Okay. You may continue then.
 A. The other — there was two detectives standing down at the carousel, Your Honor, and at that time was standing next to the defendant. The detectives was in plain clothes and overheard the defendant say to a skycap, "You're — I'm looking — you're looking for a bag with the name of Kia Green on the bag," and made reference to "be careful when you lift the bag. The bag is heavy."
 The other detectives watched the skycap locate the bag, put the bag on his cart. The defendant and the skycap at that time went to the outside area of the airport going out towards the taxi stand.
 Just outside of the north door of the airport in front of the taxis stand area, myself and another detective encountered the defendant and showed I.D. badge and picture I.D. and asked if I could speak to her for a few minutes, at which time she said — stated, "Yes."
 With that I asked her if the bag that she had in her possession was hers, and she stated, "Yes."
And I asked if I could, in fact, look inside of the bag.
 At that time, Your Honor, she stated that she was in a hurry to get home to her baby and that she would rather not take that time.
 With that, we — I felt there was enough probable cause to have a canine, drug detection canine, go over the bag; and I explained to her it would only take a few minutes, a couple of minutes. And I would call for a canine, and she would be on her way.
 Officer Liska asked her if — at that point if we would go back to our office, we could do this. And it would only take a couple minutes, and we would get her on her way as soon as possible.
* * *
 Q. Okay. So just so I'm clear, she did not affirmatively, unequivocally say, "Yes, you can look in my bag," at that point?
A. No, sir, she did not.
 Q. * * * And then I believe you indicated that, "We'll get a canine unit," or "get a dog" or something?
 A. That's correct. I felt that I had enough probable cause at that point to take another couple minutes to bring our canine unit to have the dog run over the bag, yes, sir.
 Q. Okay. So then — okay. After — after you all have had this conversation or, rather, after you inform her of that, then where — where does the bag go and who's carrying the bag to the office?
 A. * * * Detective Liska had control of the bag. And we just walked back towards our office area. [Tr. 7-8; 21.]
At this point, the three officers walked on either side and behind defendant as they escorted her to their office. Once in the office, Detective Fisher began completing paperwork on defendant. As he did, the other detectives were in another room with the defendant's luggage. When questioned again about whether defendant gave consent to search her luggage, the best that Detective Fisher could do was speculate.
 Q. * * * At some point was Ms. Rozelle requested — was it requested a second time of her, "Would you give us permission to open your bag," your bag — you know, baggage, something like that?
 A. Not by me. I don't — I don't remember asking, myself. I don't know how the — it — if it was, it had to come from Detective Liska.
* * *
 A. Maybe he did ask or a second time like, you know, "If we're going to have the dog come in and go over your bag, you know, you — it — it's up to you. If you want us to open the bag, we can get this thing over with," or it meaning that if there's nothing in your bag, we're going to get you on your way. [Tr. 24.]
When questioned about the drug courier profile which Detective Fisher felt gave him "probable cause" to detain, he essentially stated that there was no set "profile," and merely reiterated the "source city," "one-way ticket purchased with cash" factors.
After Detective Fisher testified, defendant took the stand and testified contrary to Fisher's testimony on several key points. First, defendant testified that she stated that she did not want to talk with the detectives because she was in a hurry. However, the detectives persisted. She then stated that, although they asked to search her bag, she refused, and that there was no mention or call for a canine unit. In her own words:
 Q. And would you tell the court what — why — why did you go with these gentlemen? Why did you go?
A. I felt I had no other choice.
 Q. Why do you say that? Why do you say you didn't have any other choice?
 A. I mean, I was continuously asked, and I continually told him I didn't have the time. And they, I guess, just, you know, kind of — "well, we're just going to go to the back, and it will only take a couple of minutes," you know. * * *
 Q. * * * Of course, you also heard the detective testify though, you were not — they didn't put their hands on you or handcuff you or anything like that?
 A. No, they didn't cuff me, but * * * I remember like one holding my arm, my elbow. Not with incredible force or anything, you know. "We can just come on to the back" * * * [.]
* * *
 Q. * * * [O]ne last question about when you were being escorted. Do you remember the configuration? Were these gentlemen on either side of you, were they behind you, were they in front of you as you walked?
 A. I thought it was like on the sides of me, but I'm not for sure. [Tr. 34-35.]
When asked again if she felt like she could terminate the interrogation, the defendant replied, "Of course not." (Tr. 37.)
 Q. * * * Again, if you could just share with the court, what was your impression as to whether or not you had a choice in this whole situation? What — how would you describe that?
 A. Well, the — I did not feel like I had a choice. We were already in the room, you know, with the detectives and everything out there. Had already told them that I didn't really have the time to go through all this, so —
* * *
 — [W]hen we got back there, I felt like I didn't have any other choice to let them search the suitcase or they were going to do it on their own.
 Q. And correct me if I'm wrong, that suitcase was never back in your possession after this initial encounter near the taxis?
A. No, sir. [Tr. 38-39.]
From the foregoing, there can be no argument that defendant was seized within the meaning of the Fourth Amendment, and the state does not contest this conclusion. The issue that is then presented to the court is whether the facts known to the detectives at the time they detained the defendant amounted to a reasonable and articulable suspicion that the defendant was engaged in criminal activity.
As set forth above, at the time the detectives stopped defendant, they knew no more than that she bought a one-way ticket from El Paso, Texas, to Columbus, Ohio, with cash. This information purportedly came from an unnamed source in St. Louis, and the detectives in Columbus conducted absolutely no additional investigative police work of their own which might have suggested that the defendant was engaged in criminal activity.
Having carefully reviewed the testimony of Detective Fisher, we conclude, as the United States Supreme Court did in Reid, supra, that the officers in question could not, as a matter of law, have reasonably suspected the defendant of criminal activity on the basis of the observed circumstances. Indeed, the factual circumstances of Reid are even more compelling than the circumstances of this case. In Reid, officers were watching a commercial flight from Fort Lauderdale, Florida, a "source city" for illegal narcotics. The defendant was observed as he deplaned and proceeded through the concourse. As he did so, officers noticed him look several times at another individual who carried the same type of shoulder bag. When the two reached the main lobby, they spoke briefly and left the airport terminal building together. The two were approached outside by DEA agents who asked to speak with them, and both agreed. According to the agents, the two "appeared nervous." After being asked to furnish identification, agents asked the men to consent to a search of their baggage. Thereafter, the defendant began to run abandoning his shoulder bag. He was apprehended, and the bag was found to contain cocaine.
Based upon these facts, the United States Supreme Court explained:
 * * * Although there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot, this is not such a case. The agent's belief * * * was more an "inchoate and unparticularized suspicion or `hunch,'" than a fair inference in the light of his experience is simply too slender a reed to support the seizure in this case. * * * [Id. at 441; citations omitted.]
This principle has been reaffirmed time and again by the United States Supreme Court, as well as the courts of this state. For example, in United States v. Sokolow (1989), 490 U.S. 1, the United States Supreme Court cautioned, noting a law enforcement officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch. Id. Moreover, this court, in addition to the Ohio and United States Supreme Courts, has explained that something more than a mere claim that an individual meets certain characteristics of a "profile" of a paradigmatic drug courier is necessary. This is so because, as characterized by Justice Brennan, these types of profiles have a "chameleon-like way of adapting to any particular set of observations." Sokolow at 13. Indeed, Justice Brennan cited to the following as an example of how a drug courier "profile" can be manipulated to fit the circumstances of a particular case:
 Compare, e.g., United States v. Moore, 675 F.2d 802, 803 (CA6 1982) (suspect was first to deplane), cert. denied, 460 U.S. 1068, 103 S.Ct. 1521, 75 L.Ed.2d 945
(1983), with United States v. Mendenhall, 446 U.S. 544, 564, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980) (last to deplane), with United States v. Buenaventura-Ariza, 615 F.2d 29, 31 (CA2 1980) (deplaned from middle); United States v. Sullivan, 625 F.2d 9, 12 (CA4 1980) (one-way tickets), with United States v. Craemer, 555 F.2d 594, 595 (CA6 1977) (round-trip tickets), with United States v. McCaleb, 552 F.2d 717, 720 (CA6 1977) (nonstop flight), with United States v. Sokolow, 808 F.2d 1366, 1370 (CA9), vacated, 831 F.2d 1413 1987) (case below) (changed planes); Craemer, supra, at 595 (no luggage), with United States v. Sanford, 658 F.2d 342, 343 (CA5 1981) (gym bag), cert. denied, 455 U.S. 991, 102 S.Ct. 1618, 71 L.Ed.2d 852 (1982), with Sullivan, supra, at 12 (new suitcases); United States v. Smith, 574 F.2d 882, 883 (CA6 1978) (traveling alone), with United States v. Fry, 622 F.2d 1218, 1219 (CA5 1980) (traveling with companion); United States v. Andrews, 600 F.2d 563, 566 (CA6 1979) (acted nervously), cert. denied sub nom. Brooks v. United States, 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979), with United States v. Himmelwright, 551 F.2d 991, 992 (CA5) (acted too calmly), cert. denied, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). * * * [Id. at 13-14.]
Thousands of individuals travel everyday from and between "source" and "distribution" cities. However, the Fourth Amendment guarantee "protects alike the `traveler who carries a toothbrush and a few articles of clothing in a paper bag' and `the sophisticated executive with the locked attaché case.'" Smith v. Ohio (1990), 494 U.S. 541, 542. While drug courier profiling may be an aid to law enforcement in the effort to stop drug trafficking, and might allow agents to conduct further investigation or seek consensual questioning, it does not itself provide the reasonable suspicion necessary to justify a seizure of suspected drug traffickers. As Judge Moyer, now Chief Justice Moyer, wrote in Hassey, supra: "[t]o allow the police to stop travelers merely because they display any three or four of the profile characteristics would be to sanction `virtually random seizures' of all air travelers" to find illegal drugs. Id. at 235. Therefore, before a seizure of a suspected drug courier is justified, the police must rely on additional factors to provide the reasonable suspicion to make a valid stop; i.e., a suspect must exhibit specific and significant suspicious behavior. Reid, supra; Hassey, supra, at 235.
The anonymous tip in this case did not exhibit sufficient "indicia of reliability" in an assertion of illegality to provide the needed "additional factor" to make the seizure valid. See Florida v. J.L. (2000), 529 U.S. 266. Moreover, the circumstances did not entail a great amount of danger that would justify a seizure or search on the basis of information which would otherwise be deemed insufficient. Id. at 273-274.
Based upon the foregoing, defendant's assignment of error is sustained, the judgment of the Franklin County Court of Common Pleas is reversed, and this cause is remanded to that court for further proceedings in accordance with law, consistent with this opinion.
Judgment reversed and cause remanded.
BRYANT, P.J., and TYACK, J., concur.