The STATE of Ohio, Appellee,

v.

ALEXANDER, Appellant.

[Cite as *State v. Alexander,* 151 Ohio App.3d 590, 2003-Ohio-760.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 81529.

Decided Feb. 20, 2003.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Peter J. Gauthier, Assistant Prosecuting Attorney, for appellee.

Edward S. Wade Jr., for appellant.

MICHAEL J. CORRIGAN, Presiding Judge.

{¶ 1} Defendant Tony Alexander pleaded no contest to charges of possession of drugs and preparation of drugs for sale after the court denied his motion to suppress evidence of approximately one kilogram of cocaine seized from his bag at a train station. The court found Alexander guilty. The sole assignment of error in this appeal contests several aspects of the court's ruling on the motion to suppress.

{¶ 2} When reviewing a trial court's rulings on motions to suppress evidence, we give the court's factual findings significant deference because, as the trier of fact, the court is in the best position to resolve factual questions and evaluate the credibility of the witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. This is the familiar "competent, credible evidence" standard of any factual issue decided in a criminal case. See *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. We undertake independently, however, the determination whether the court properly applied those factual determinations to the law. *Ornelas v. United States* (1996), 517 U.S. 690, 696–699, 116 S.Ct. 1657, 134 L.Ed.2d 911; *State v. Klein* (1991), 73 Ohio App.3d 486, 488, 597 N.E.2d 1141. Because this case raises issues under the Fourth Amendment to the United States Constitution, we use federal law to analyze the issues because the Ohio constitutional guarantee against unreasonable searches is coextensive with the federal guarantee. *State v. Murrell* (2002), 94 Ohio St.3d 489, 493, 764 N.E.2d 986.

{¶ 3} The facts are undisputed for purposes of appeal. A special agent in the interdiction group of the Cleveland office of the Drug Enforcement Agency ("DEA") learned from another agent in Albuquerque, New Mexico, that a suspected drug courier by the name of Tony Alexander would be coming to Cleveland on the Amtrak train from New York City. The agent learned that Alexander had purchased a one-way train ticket for the 4:30 p.m. train with cash. He reserved the ticket at 2:00 p.m. on the day of departure and paid for it at 3:43 p.m., using $272 in cash. Alexander gave Amtrak a telephone number that had been disconnected. The agent also learned that Alexander had purchased a bus ticket to Louisville, Kentucky.

{¶ 4} When the train pulled into the Cleveland station, two agents were present. They approached Alexander after he alighted from the train and spent three to four minutes speaking with him. There is no testimony about the contents of that conversation. The agents then "detained" Alexander's bag, gave him a receipt for the bag, and allowed him to leave. After taking the bag to their office, the agents brought in a drug-sniffing dog from the Cleveland Police Department. The dog sniffed Alexander's bag but did not alert the agents to any drugs. Nevertheless, one of the agents drafted a search warrant and took it to the court of common pleas to present to a judge. The officer happened to run into a judge who was waiting for an elevator on the ground floor of the courts tower, so he asked that judge to sign the warrant. Although the affidavit for the search warrant did not indicate that the dog had failed to detect the presence of drugs in Alexander's bag, the judge asked specifically whether a drug-sniffing dog had been used. The officer replied that a dog had been used but had failed

to detect drugs. The judge signed the warrant anyway. The officers found approximately 900 grams of cocaine in the bag.

## I

{¶ 5} Alexander first argues that the court erred by denying the motion to suppress because the police lacked a specific and articulable reason to stop and search him.

{¶ 6} Although Alexander couches this argument in terms of *Terry v. Ohio* (1968), 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889, the facts of this case show that the police did not conduct a *Terry* stop. In *United States v. Peters* (C.A.6, 1999), 194 F.3d 692, 698, the Sixth Circuit Court of Appeals stated:

{¶ 7} "As the Supreme Court stated in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), no seizure occurs when police 'ask questions of [an] individual, ask to examine the individual's identification, and request consent to search his or her luggage—as long as the officers do not convey a message that compliance with their requests is required.' *Id.* at 435, 111 S.Ct. 2382 [115 L.Ed.2d 389] (citations omitted). See also *United States v. Frazier* [ (C.A.6 1991) ] 936 F.2d [262] at 265; *United States v. Winfrey* [ (C.A.6 1990) ], 915 F.2d [212] at 216. Because law enforcement officials may approach individuals and propose initial questions without having any reasonable suspicion of criminal activity, if the police do nothing to convey to the defendant that he is not free to leave, the encounter does not become a seizure for Fourth Amendment purposes as long as the individual consents to questioning, which the defendant herein did. Absent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled, the agent's request for additional identification and voluntarily given information from the defendant does not constitute a seizure under the Fourth Amendment. See *Florida v. Rodriguez*, 469 U.S. 1, 5, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984); *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)."

{¶ 8} The evidence did not show anything that could remotely be considered coercive in compelling Alexander's consent to questioning. The uncontradicted evidence showed that the encounter was very brief, lasting only three to four minutes. There was no testimony whatsoever about the content of that conversation, so Alexander has no means of proving how the police might have coerced his consent to the conversation. The empty record of this conversation means that we must give deference to the court's findings, and we therefore find the encounter on the train platform to be consensual.

## II

{¶ 9}  Although the agents did not seize Alexander while speaking to him on the platform, they did take his bag for further investigation.  The next issue is whether the police violated Alexander's rights by seizing the bag.

{¶ 10}  The United States Supreme Court has refused to set a bright-line rule for when a consensual encounter transforms into a detention, instead choosing to let each case be decided on its own facts by examining the totality of the circumstances.  *Florida v. Royer* (1983), 460 U.S. 491, 506–507, 103 S.Ct. 1319, 75 L.Ed.2d 229;  *United States v. Mendenhall* (1980), 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (plurality opinion).

{¶ 11}  A consensual encounter turns into an involuntary detention when the police infringe upon the liberty of the individual through the use of coercive behavior.  In this context, coercive behavior can be the seizure of a person or property.  But the nature of the seizure itself will determine whether it is a permissible governmental intrusion of a liberty interest.  In *United States v. Place* (1983), 462 U.S. 696, 706, 103 S.Ct. 2637, 77 L.Ed.2d 110, the United States Supreme Court stated:

{¶ 12}  "Given the fact that seizures of property can vary in intrusiveness, some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime."

{¶ 13}  The court went on to conclude:

{¶ 14}  "[W]hen an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope."  *Place*, 462 U.S. at 706, 103 S.Ct. 2637, 77 L.Ed.2d 110.

{¶ 15}  It is important to understand that the *Terry* standard applies only to the showing needed to temporarily detain the personal property pending further investigation, not to whether there was probable cause for an arrest.  A *Terry* stop is, of course, a "seizure" for purposes of the Fourth Amendment.  But it is only a minimal intrusion for investigation, for which the police need only set forth "specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime."  *United States v. Johnson* (C.A.7, 1990), 910 F.2d 1506, 1508.  In *State v. Franklin*, 97 Ohio St.3d 1, 776 N.E.2d 26, 2002-Ohio-5304, at ¶ 11, the Ohio Supreme Court stated the

standard as follows: "[A] law enforcement official is permitted to stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that 'criminal activity may be afoot,' even if the officer lacks probable cause," quoting *Terry,* 392 U.S. at 30, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 16} The agent testified that Alexander met the profile of a drug courier— what the United States Supreme Court has described as "a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics." *Reid v. Georgia* (1980), 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890. Alexander fit the profile of a drug courier, since he purchased a one-way ticket for cash from a "gateway" drug city shortly before the train left the station. See *United States v. Gordon* (C.A.10, 1999), 173 F.3d 761, 764 fn. 1. Moreover, he gave Amtrak a nonworking telephone number.

{¶ 17} In *Reid,* the United States Supreme Court said that the drug courier profile "describe[s] a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation [as the profile] could justify a seizure." *Reid,* 448 U.S. at 441, 100 S.Ct. 2752, 65 L.Ed.2d 890. Nevertheless, the Supreme Court stated that "there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." Id. Taken together, seemingly innocent facts might be sufficient to establish a reasonable suspicion of criminal activity, regardless of whether those facts fall within a profile used by law enforcement officials, particularly when accompanied by other evidence. *United States v. Sokolow* (1989), 490 U.S. 1, 10, 109 S.Ct. 1581, 104 L.Ed.2d 1. The determination must be based on the totality of the circumstances, which has been held to weigh in favor of "the officers' experience and knowledge, the characteristics of persons engaged in illegal activities, and the behavior of the suspect." *United States v. Sterling* (C.A.7, 1990), 909 F.2d 1078, 1083–1084.

{¶ 18} We find that the totality of the circumstances permitted the detention of Alexander's bag for further investigation, since the facts, while seemingly innocent when considered individually, nonetheless show a sufficient degree of suspicion when viewed collectively. Alexander traveled from New York, a city known as a gateway for transportation of illegal drugs. He bought a one-way seat on Amtrak train No. 49, which the agent said was known to carry drug couriers. Alexander reserved his ticket just two hours before departure and paid cash for the ticket just one hour before the train left the station. He carried just one bag. When he made his reservation, he gave Amtrak the number for a telephone that had been disconnected.

{¶ 19} Alexander cites *State v. Washington* (2001), 144 Ohio App.3d 482, 760 N.E.2d 866, as authority for the proposition that the totality of the circumstances

does not justify the agents in conducting a further investigation of his bag. *Washington* had facts somewhat similar to those in this case—an alleged drug courier traveling to Cleveland on the No. 49 Amtrak train from New York. But the similarity ends there. The opinion noted that crucial facts that gave rise to the DEA's suspicions of wrongdoing—that a ticket had been reserved and paid for with cash shortly before the train departed and that no call-back number had been left with Amtrak—were not in the record. *Washington,* 144 Ohio App.3d at 486, 760 N.E.2d 866, fn. 1. Those same facts are in evidence in this case.

{¶ 20} We do believe it important, however, to state our disagreement with *Washington's* conclusion that the police lacked an articulable suspicion of wrongdoing sufficient to justify a seizure. That conclusion is contrary to the great weight of authority across the country because it failed to view innocent factors collectively under the totality of the circumstances and in conjunction with the agents' training and experience. For example, the opinion noted that Washington carried new luggage. While we agree that this fact can be innocuous, new luggage is often used by drug couriers. See *United States v. Tillman* (C.A.8, 1996), 81 F.3d 773; *United States v. Franco–Munoz* (C.A.9, 1991), 952 F.2d 1055.

{¶ 21} Likewise, traveling on a one-way ticket is often viewed as an important part of the drug courier profile. *United States v. Travis* (C.A.6, 1995), 62 F.3d 170, 174–175; *United States v. Flowers* (C.A.6, 1990), 909 F.2d 145 (one-way ticket, Los Angeles to Detroit, purchased for cash); *United States v. Johnson* (C.A.7, 1990), 910 F.2d 1506 (one-way, Los Angeles to Chicago, Amtrak rail ticket).

{¶ 22} Washington's use of a ticket issued to a person of a different name is a typical ploy used by drug couriers. See *United States v. Low* (C.A.9, 1989), 887 F.2d 232 (ticket showed the name "Mark Lund"); *United States v. Cordell* (C.A.7, 1983), 723 F.2d 1283 (names on airline ticket and driver's license did not match).

{¶ 23} In *United States v. Mendenhall* (1980), 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497, the United States Supreme Court noted that Mendenhall had been the last person to leave the plane and cited this as a factor in the profile of a drug courier. See, also, *United States v. Harrison* (C.A.4, 1982), 667 F.2d 1158 (among the last passengers to deplane).

{¶ 24} Finally, Washington's nervousness upon being approached by the DEA would have been in character with conduct displayed by other drug couriers. See, e.g., *United States v. Campbell* (C.A.8, 1988), 843 F.2d 1089 (suspect appeared nervous, hands trembled and spoke in a "quivering" voice); *United States v. Johnson,* supra (suspect "began to tremble and shake" when stopped by the police); *United States v. Cruz–Hernandez* (C.A.11, 1995), 62 F.3d 1353, 1356, fn. 2 (considering suspect's nervousness as factor contributing to reasonable suspicion).

{¶ 25} When taking all of the above factors into consideration as part of the totality of the circumstances, we must depart from *Washington*. That decision is clearly contrary to established law. In fact, the outcome in *Washington* could be considered to be result-oriented, given the panel's insistence upon discussing an issue of racial profiling, an issue that the panel itself conceded was dicta because "we have decided the case on other grounds and Washington failed to present any evidence to prove a claim of racial profiling." *Washington*, 144 Ohio App.3d at 493, 760 N.E.2d 866. The panel's admission that it was stating dicta, coupled with its refusal to consider drug courier profiles as part of the totality of the circumstances, raises serious doubts as to its objectivity. It also leaves the opinion so wanting that it must be limited to its specific facts and not considered persuasive.

{¶ 26} We therefore hold that the totality of the circumstances gave the police an articulable suspicion of criminal activity and justified the seizure of Alexander's bag.

### III

{¶ 27} In *United States v. Place* (1983), 462 U.S. 696, 706, 103 S.Ct. 2637, 77 L.Ed.2d 110, the United States Supreme Court stated, "When an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigation detention is properly limited in scope." The next issue we consider is whether the detention of Alexander's bag was properly limited in scope and duration under *Place*.

{¶ 28} The agent testified that he and his partner encountered Alexander outside the Amtrak train at 8:15 a.m. They spoke to him for "three to four minutes" and then detained his bag and allowed him to leave. They took the bag back to the DEA office (which was located just minutes from the Amtrak station) and called the Cleveland Police to send over a drug-sniffing dog. The dog arrived anywhere from 30 to 40 minutes later after they called. The agent concluded that the dog sniffed the bag at about 9:00 a.m. While waiting for the drug-sniffing dog to arrive, the agent who testified said that he started preparing an affidavit for a search warrant. The agent finished drafting the warrant at 9:30 a.m. The judge signed the warrant at about 9:40 a.m. and the agents executed the warrant at about 9:50 to 10:00 a.m.

{¶ 29} In *Farm Labor Organizing Commt. v. Ohio State Hwy. Patrol* (C.A.6, 2002), 308 F.3d 523, 545–546, the Sixth Circuit Court of Appeals made the following observations:

{¶ 30} "Rather than adopt a per se time limitation for seizures based upon less than probable cause, however, the Supreme Court has consistently 'emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.' *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); see also *Place*, 462 U.S. at 709–10, 103 S.Ct. 2637 [77 L.Ed.2d 110]. 'Much as a "bright-line rule" would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.' *Sharpe*, 470 U.S. at 685, 105 S.Ct. 1568 [84 L.Ed.2d 605]; see also *Place*, 462 U.S. at 709, 103 S.Ct. 2637 [77 L.Ed.2d 110] ('In assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation.')."

{¶ 31} Although the Supreme Court has expressed a reluctance to place a per se time limit for seizures based upon less than probable cause, the court did note that it had "never approved a seizure of the person for the prolonged 90–minute period involved here and [could] not do so on the facts presented by this case." *Place*, 462 U.S. at 709–710, 103 S.Ct. 2637, 77 L.Ed.2d 110. Since we must view the facts in a light most favorable to the state, we find that the total time elapsed from the seizure of Alexander's bag until obtaining a search warrant was 101 minutes. This assumes a seizure of the bag at 8:19 a.m. and the execution of the search warrant at 9:50 a.m. We choose the execution of the warrant as the stopping point in time because the drug-sniffing dog did not alert the agents to the presence of drugs in Alexander's bag. We believe this cutoff point is analytically consistent with decisions of courts that have held that a positive dog alert is the end point for determining the length of a seizure of luggage. See, e.g., *United States v. Hooper* (C.A.2, 1991), 935 F.2d 484, 495. Because the dog did not alert to the presence of drugs we believe the actual discovery of the drugs would be the next best logical end point.

{¶ 32} The 101 minutes it took is beyond the 90 minute seizure that the Supreme Court found unreasonable in *Place*. Nonetheless, we cannot decide this case by mere application of elapsed time, for that would institute a per se rule of the kind rejected by the Supreme Court. We must consider the circumstances, if any, that caused the delay.

{¶ 33} In *Place*, the delay was occasioned by the need to transport the bag from LaGuardia Airport to Kennedy Airport, where a drug-sniffing dog waited. The Supreme Court found it significant that the police had been alerted to Place's arrival well in advance yet failed to ensure that a dog was present at LaGuardia Airport. *Place*, 462 U.S. at 709, 103 S.Ct. 2637, 77 L.Ed.2d 110.

{¶ 34} As in *Place*, the agents knew hours in advance that Alexander was due to arrive yet did not have a dog waiting. Amtrak train No. 49 travels overnight

from New York to Cleveland, departing New York at 4:30 p.m. and arriving in Cleveland at 6:00 a.m. the following morning. The record is unclear as to exactly when the agent first received information about Alexander, but it was certainly the day before the train arrived in Cleveland. The agent conceded in his testimony that he could have had a dog waiting for the train.

{¶ 35} Despite this, we are not troubled by the DEA's failure to have a dog present at the train station. The DEA does not have its own dog in Cleveland, and relies on the Cleveland Police Department to supply dogs for drug interdiction. In many cases, it might be advisable to have the dog present and ready in order to save time, but time was not a paramount concern in this case. The agent testified that the DEA offices are located on West 3rd Street and Lakeside Avenue in downtown Cleveland. This is just two or three minutes from the train station. Unlike *Place*, where the police were required to negotiate New York City traffic to travel from one airport to another, the agents delayed for only a matter of minutes.

{¶ 36} It took about 30 minutes for the dog and his handler to arrive at the DEA offices. Hence, at the time the dog actually sniffed the bags, only 33 minutes had elapsed. This period of time is not excessive under the circumstances.

{¶ 37} As noted, the DEA does not have its own drug-sniffing dog and relied in this case on the Cleveland Police Department's canine unit. Under these circumstances it would have been unreasonable for the DEA to expect the Cleveland police to have their dog on loan waiting for more than two hours for the arrival of train No. 49. More to the point, this does not demonstrate a lack of diligence, as required by *Place*. It is important to bear in mind that *Place* said that strict time limits on seizures of luggage "would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation." *Place*, 462 U.S. at 709, 103 S.Ct. 2637, 77 L.Ed.2d 110, fn. 10. On the facts of this case, that statement means that the police have room to determine in the first instance whether a seizure is warranted. It is just as likely that a person fitting within the profile of a drug courier has an innocent explanation or displays no other conduct that would give the police reasons for a detention. That being the case, forcing the police to have a dog at the ready would go well beyond the demands of the situation, particularly since the DEA offices were located so close to the train station. See *United States v. Sterling*, 909 F.2d at 1085 (finding that failure to call ahead for a canine unit not dilatory because, among things, "it is never clear until near the end of the operation at which point a seizure can be made properly"); *United States v. Borys* (C.A.7, 1985), 766 F.2d 304, 314 (noting that DEA was not required to have a drug detection dog immediately available, but only readily available).

{¶ 38}   Likewise, the length of time it took the dog and its handler to arrive at the DEA offices was not unreasonable.   There was no testimony to show why it took 30 to 40 minutes for the Cleveland police dog to arrive, but that does not show a lack of diligence on behalf of the DEA. See *United States v. Frost* (C.A.3, 1993), 999 F.2d 737, 742.   The agents called promptly for the dog and thus discharged their duty to act with diligence.

{¶ 39}   The length of time in which to write out the application for a search warrant was not so long as to render the seizure of the bag invalid under *Place*. The agent testified that he began preparing the affidavit for the search warrant application after he first called for the dog and before the dog arrived.   Warrant preparations were placed on hold as the dog was deployed on Alexander's bag. When the dog failed to alert to the presence of drugs, the agent went back to preparing the affidavit.   The agent's testimony thus showed that it took him about an hour to prepare the affidavit and observe the dog sniff Alexander's bag. We are in no position to say how long it should take to prepare an affidavit in an application for a search warrant, but we can say that one hour is not too long. See, e.g., *United States v. Respress* (C.A.6, 1993), 9 F.3d 483, 486 (finding ten-hour delay between seizure of suitcase and issuance of search warrant not unreasonable given lateness of hour and time needed to prepare an affidavit). Admittedly, we do not have a copy of the affidavit to examine for ourselves. Nonetheless, the court stated that it reviewed the affidavit "carefully" and made the express finding that "the timeline" was "not unreasonable."   Given the lack of any evidence to contradict the court's finding, we see no reason to depart from the basic principle of appellate review that requires us to defer to the court because of its superior position as trier of fact.

{¶ 40}   Finally, the length of time needed to take the search warrant application to a judge is insignificant.   The agent testified that he immediately took the affidavit to the court of common pleas and had a judge sign the affidavit while the judge was waiting for an elevator.   The DEA offices are across the street from the court of common pleas and the walk there would have taken only minutes.

{¶ 41}   Viewing the facts in light of the circumstances here shows that the length of time required to deploy the canine unit on Alexander's bag and the resulting time needed for preparing and presenting the application for the search warrant was reasonable.   We are aware that the 101–minute delay is somewhat beyond that which was rejected in *Place*.   However, we find that the facts of this case differ in important respects from *Place*, particularly as to the diligence of the DEA agents in conducting their investigation.   None of the delay in this case was caused by the agents.   The individual actions of the agents independently showed promptness of purpose under the circumstances.   We therefore find the

seizure of Alexander's bag pending further investigation was not so lengthy as to violate his Fourth Amendment rights.

## IV

{¶ 42} Alexander's final argument is that the affidavit was insufficient to establish cause for the warrant because it lacked the requisite particularized facts regarding the alleged criminal activity. This is essentially an argument that the court lacked the necessary cause to issue the warrant because the dog's failure to alert to the presence of drugs provided no new support beyond the reasonable suspicion the police had to seize the bag for the dog sniff.

{¶ 43} Probable cause is a "practical, nontechnical conception," *Illinois v. Gates* (1983), 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527, that turns "on the assessment of probabilities in particular factual contexts." Id. at 232, 103 S.Ct. 2317, 76 L.Ed.2d 527. In the case of a search warrant, probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 238, 103 S.Ct. 2317, 76 L.Ed.2d 527.

{¶ 44} In *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, the Ohio Supreme Court gave the following standard for reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant:

{¶ 45} "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." Id. at paragraph two of the syllabus.

{¶ 46} In a specialized area like drug interdiction, the court should consider the evidence from the perspective of one who is trained in the field of law enforcement. *United States v. Cortez* (1981), 449 U.S. 411, 417–418, 101 S.Ct. 690, 66 L.Ed.2d 621.

{¶ 47} Alexander first argues that the agents did not act in good faith when preparing the affidavit for the search warrant because they did not state that the dog failed to alert to the presence of drugs.

{¶ 48} The police have the affirmative obligation to ensure that affidavits submitted in support of an application for a search warrant do not contain misleading information. In *Franks v. Delaware* (1978), 438 U.S. 154, 155–156, 98 S.Ct. 2674, 57 L.Ed.2d 667, the Supreme Court held that when the accused proves by a preponderance of the evidence:

{¶ 49} "[A] false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that * * * the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

{¶ 50} The omission of material information is viewed in the same light as the inclusion of false information, so that the failure to inform the court that a drug-sniffing dog failed to alert on an item constitutes misleading information as prohibited by *Franks*. See *United States v. Jacobs* (C.A.8, 1993), 986 F.2d 1231, 1235 (invalidating search warrant because the police said that a drug dog "exhibited an interest" in a package, but did not tell the magistrate that the dog failed to alert on the package). See, also, *United States v. Frost* (C.A.3, 1993), 999 F.2d 737, 743 fn. 2 (acknowledging that *Franks* applies "to situations where affiants had omitted information from the affidavit").

■ {¶ 51} The affidavit used in support of the application for a search warrant is not in the record. The transcript of the suppression hearing shows that both parties cited the affidavit during the suppression hearing and that defense counsel specifically used the affidavit during the cross-examination of the DEA agent. The court also referred to the affidavit in its oral ruling on the motion by saying that it had "carefully" read the affidavit. However, the affidavit was neither offered nor admitted into evidence. As a reviewing court, we are limited to examining the parts of the record that are properly before us. See App.R. 12(A). When an affidavit filed in support of an application for a search warrant is not offered into evidence or otherwise preserved for appeal, we cannot review its substance. See *State v. Demos* (Sept. 1, 1998), Mahoning App. No. 94 CA 132, 1998 WL 574797; *State v. Dooloukas* (Jan. 25, 1994), Adams App. No. 555, 1994 WL 21750. We must presume that the court's basis for finding probable cause to issue the warrant was correct. *Columbus v. Hodge* (1987), 37 Ohio App.3d 68, 523 N.E.2d 515.

■ {¶ 52} Even had the warrant been included in the record, we would not find that the agents misled the judge in their application for a search warrant. It is true that the affidavit did not mention that the dog failed to alert on Alexander's bag. However, the agent testified that the judge to whom he presented the affidavit specifically asked if a dog had been deployed. The agent replied that the dog had been used but failed to alert on the bag. Hence, the judge had the information that Alexander now claims was so crucial in deciding whether to sign the search warrant. The judge issuing the warrant was not acting on misleading information or on the absence of information when deciding to issue the search warrant.

{¶ 53}  The closer question is whether there was probable cause to issue the search warrant.  Alexander maintains that the agents did not have probable cause to seek a warrant at the time they deployed the dog on his bag (otherwise they would not have asked for the dog), so the dog's failure to alert could not have let a reasonable suspicion ripen into probable cause to believe that the bag contained drugs.

{¶ 54}  Alexander's argument incorrectly assumes that the dog sniff is the sine qua non of probable cause in this case.  First, the agent testified that he did not place very great stock in a dog alert for drugs, saying that it only factored about "ten percent" into his decision to seek a warrant.  If the court believed this statement, the dog sniff would not have been as crucial to the formation of probable cause as believed by Alexander.

{¶ 55}  The obvious retort to the agent's statement about how little influenced he was by the dog sniff is "Why bother with the dog at all?"  The answer that comes immediately to mind is that an alert by a drug-sniffing dog makes for an even stronger case to present in the application for a search warrant.  It usually takes so little time to secure the presence of a drug-sniffing dog that that additional step would be a prudent way of strengthening the reasons for seeking the search warrant.  This case proves the point.  The agent testified that he had been preparing the affidavit for the search warrant while waiting for the dog to arrive and then continued preparing the affidavit after the dog failed to alert on the bag.  It seems that the preparation of the affidavit would have taken a finite amount of time anyway, so requesting the services of the dog would not have delayed the process in any way.

{¶ 56}  Second, the dog's failure to alert on the bag did not nullify the agents' suspicions that Alexander carried drugs.  It has often been held that a positive dog alert can be sufficient to establish probable cause to support a search warrant.  See, e.g., *United States v. Ludwig* (C.A.10, 1994), 10 F.3d 1523, 1527 ("a dog alert usually is at least as reliable [for the presence of drugs] as many other sources of probable cause" unless "the particular dog had a poor accuracy record"); *United States v. Diaz* (C.A.6, 1994), 25 F.3d 392, 394 ("For a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established").  But these statements do not mean that a dog's failure to alert on an item means that no probable cause would exist.  Probable cause can be established by any means that establish a "fair probability" that evidence of a crime may be found.  A positive dog alert might make the probability of finding evidence of crime better than fair, but other factors or circumstances can exist that could convince the magistrate that probable cause to believe that a fair probability exists that evidence of crime might be found.

{¶ 57} The agent testified that Alexander fell within the drug courier profile. The agent's experience in drug interdiction led him to believe that Alexander would be carrying drugs. This was not just a hunch, but a conclusion based upon years of experience in dealing with cases like this. It is not our job to step into the shoes of the issuing magistrate and determine the matter of probable cause anew. The "great deference" we must give to the issuing magistrate's decision precludes us from substituting our judgment for that of the judge. And even if this case could be considered "marginal," we must nonetheless give the judge issuing the search warrant the benefit of the doubt and resolve this matter in favor of upholding the warrant. *State v. George,* 45 Ohio St.3d at paragraph two of the syllabus. We therefore find that the search warrant was issued with sufficient probable cause to believe that Alexander's bag contained evidence of crime. The assigned errors are overruled.

Judgment affirmed.

ANN DYKE, J., concurs.

COLLEEN CONWAY COONEY, J., concurs in judgment only.