[Cite as *State v. Casi*, 2020-Ohio-3063.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                      Court of Appeals Nos. WD-19-023
                                                                            WD-19-024
          Appellee
                                                  Trial Court Nos. 2018CR0125
v.                                                                 2018CR0243

Dulce M. Casi                                     **DECISION AND JUDGMENT**

          Appellant                               Decided:  May 22, 2020

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

W. Alex Smith, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} In this consolidated appeal, defendant-appellant, Dulce Casi, appeals the

February 26, 2019 and March 4, 2019 judgment entries of the Wood County Court of

Common Pleas which, following appellant's no contest pleas to multiple drug possession

and trafficking charges, sentenced her to ten years of imprisonment.  Because we find

that appellant did not give unequivocal consent prior to the search of her vehicle, we reverse the court's denial of her motion to suppress.

## Facts and Procedural Background

{¶ 2} On March 6, 2018, at approximately 2:00 p.m., appellant was traveling eastbound on the Ohio Turnpike (I-80/90) in Wood County, Ohio, when she was stopped by Ohio State Highway Patrol (OSHP) Trooper Jason Archer for driving 65 m.p.h. in a 70 m.p.h. zone in the center lane, a marked lane violation, and following too closely.

{¶ 3} Trooper Archer had appellant sit in his cruiser while he asked several questions pertaining to her route, destination, and reason for travel. Archer radioed OSHP Trooper Brian Holden to conduct a K-9 unit drug-detection walk around appellant's vehicle. The K-9 did not alert to any narcotics. At that point, the troopers switched positions and Trooper Archer, after requesting consent, began searching the vehicle. Trooper Holden reviewed and had appellant sign a consent-to-search form.

{¶ 4} Trooper Archer observed a fresh cut on the rocker panel (steel piece running between the front and rear wheels below the doors) on the passenger side. Nine packages containing suspected narcotics were found Appellant was then given her *Miranda* warnings and placed under arrest. Appellant ultimately admitted to transporting narcotics for profit.

{¶ 5} On April 18, 2018, appellant was indicted on four counts: possession of criminal tools, hidden compartment, and possession and trafficking of cocaine with major drug offender specifications. A second four-count indictment was filed on May 17, 2018,

2.

charging appellant with possession and trafficking of heroin, and aggravated possession and trafficking of drugs, to wit, fentanyl. All counts in the indictments contained forfeiture of property specifications. The cases were joined on June 19, 2018.

{¶ 6} On July 23, 2018, appellant filed a motion to suppress all evidence relating to the stop and search of her vehicle and appellant's detention, arrest, and interrogation. The suppression hearing was held over four days. Troopers Archer, Holden, Martin, and Rothenbuhler testified.

{¶ 7} Trooper Jason Archer testified that on March 6, 2018, he was conducting traffic surveillance in conjunction with his criminal interdiction duties on the Ohio Turnpike in Wood County, Ohio, when appellant's eastbound Black Acura caught his attention. Trooper Archer first noticed that the vehicle was driving 64 m.p.h. in a 70 m.p.h. zone, and had Arizona license plates and tinted windows. Archer indicated that he stopped appellant's vehicle for committing a marked lanes violation and following too closely.

{¶ 8} Trooper Archer stated that when assessing the cause of a moving violation he relies on the verbal response from the motorist as well as the nonverbal responses such as the general level of alertness, trembling hands, the carotid pulse, the odor of alcohol, etc. If Trooper Archer decides to proceed with the investigation, he will then check the driver's license, registration, and insurance and run a criminal background check. Trooper Archer stated that the issuance of a warning could take anywhere from a few minutes to 15-20 minutes due to variables like an out-of-state motorist or if the in-unit

3.

computer was not operating properly and dispatch had to be called. Issuing a citation involves acquiring more identifying information, including personal and situational, and printing it from the computer.

{¶ 9} Trooper Archer was then questioned about the use of criminal indicators in law enforcement. Archer stated that his observation begins while he is sitting in his vehicle and readily observable by motorists. Archer watches the response to his vehicle. Trooper Archer stated that the "innocent motoring public" generally slows down when they see his patrol vehicle and then speeds back up after passing. Archer also explained the term pipeline as it relates to drug trafficking. Archer stated that a lot of illegal drug distribution originates in the south, often through the southern border, and is transported north and east via Interstate 75 and the Ohio Turnpike.

{¶ 10} Turning back to the traffic stop at issue, Trooper Archer observed appellant's vehicle travelling slower than other motorists, having tinted windows, Arizona license plates, and being somewhat dirty. Archer stated that he pulled out and began following the vehicle. Trooper Archer stated that he then observed appellant's vehicle's left tires cross the divided white line separating the middle and left lanes. At this point he activated his camera which had a one to one-half minute look-back recording capability; Archer began narrating the video as it was played for the court.

{¶ 11} Trooper Archer stated that he then observed a tractor-trailer move into the middle lane in front of appellant who applied the brakes but did not move into the open left lane. According to Trooper Archer, this resulted in appellant following too closely;

4.

two to three car lengths rather than six, per the recommended one per 10 m.p.h. Appellant eventually moved to the far right lane and then back to the center lane. Archer stated that the behavior was indicative of evasion or trying to blend in with traffic.

{¶ 12} Trooper Archer testified that at this point he was still surveilling appellant's vehicle and accumulating information. He denied receiving any tip or information from any source and stated that his suspicions were based solely on "training and experience."

{¶ 13} Trooper Archer stated that he decided to stop appellant's vehicle based on the offenses of travelling too closely, marked lanes of travel, and driving too slowly in the center lane. Once stopped, Archer approached the passenger side of the vehicle; he found it unusual that appellant asked him how he was doing just as he began to speak.

{¶ 14} Trooper Archer explained the reason for the stop and began asking questions pertaining to her reason for travel. Archer stated that these "dual purpose" questions allowed him to either validate or negate various factors he observed. "Root causes" of the violations could include driver fatigue, an impaired driver, a medical condition, or an inattentive driver. Appellant admitted that she was tired.

{¶ 15} When questioned about her destination, appellant stated that she was going to New York to visit an uncle who was ill. Trooper Archer found it odd that appellant did not know her exact destination. Archer stated that individuals involved in certain criminal activity may not know their destination at the start of travel; it is revealed incrementally by the higher-ups in the organization for protection.

5.

{¶ 16} Trooper Archer stated that when he was speaking with appellant he noticed that she was wearing a rosary around her neck. Archer, as a practicing Catholic, found it odd because it is generally not done in his culture. Archer explained that this could be considered a "disclaimer" or a sign used in an attempt to show that appellant was a good, law-abiding person. Other disclaimers used by motorists include bibles or other religious items and pro-America or police bumper stickers.

{¶ 17} Trooper Archer asked appellant to exit her vehicle and go back to his patrol SUV. Archer stated that appellant was uncharacteristically cooperative and overly polite, even asking whether she should shut off her engine. At that point, Archer stated that he had an "aha moment" and was convinced that criminal activity was taking place. Trooper Archer then radioed Trooper Holden to conduct a K-9 exterior walk-around of the vehicle.

{¶ 18} Trooper Archer, a K-9 handler as well, explained that a K-9 is another tool used to give a "defined final response." Archer further explained that K-9s are not perfect and that there have been instances where a dog did not alert and narcotics were found. Trooper Archer stated that there are many variables that can affect the dog's accuracy including the packaging of the drugs (sealing or masking agents), the location of the drugs, the vehicle's exhaust, and wind created by passing vehicles.

{¶ 19} Prior to Trooper Holden's arrival, Trooper Archer discovered that appellant's vehicle had been recently purchased, registered and insured. Archer stated

6.

that he considered this relevant because it may be a criminal indicator that the vehicle was being used specifically for that trip.

{¶ 20} Archer continued to question appellant about the details of her trip. Archer asked appellant why she did not fly from Arizona to New York; appellant stated that she does not fly. Archer ascertained the city appellant was from and that it was one-to-two hours from the border with Mexico. Appellant then began talking about a winter storm that impacted her trip. Archer questioned why did not drive the southern route and avoid the weather; he stated that she could have been instructed to take the northern route due to heavy drug interdiction patrol in Missouri and Tennessee. Appellant stated that her GPS took her that way.

{¶ 21} Trooper Holden then arrived and proceeded to walk the K-9 around the vehicle. Archer stated that appellant became more nervous. Archer asked appellant if she had any of the substances the K-9 was trained to detect; appellant responded "I don't think so." Appellant also indicated that she had not looked in the trunk since purchasing the vehicle. Trooper Archer stated that appellant became increasingly distracted with the dog sniff; Trooper Holden's walk around of the K-9 did not result in a hit.

{¶ 22} At this point, appellant had been detained for approximately nine minutes. Archer indicated that he felt that appellant's story did not make sense and that based on all the criminal indicators he had reasonable articulable suspicion that criminal activity was afoot. Trooper Archer stated that at this point he asked appellant for her consent to search the vehicle. Archer agreed that he asked three times for her consent to search.

7.

Appellant's responses included: "I don't think so, I have nothing to hide"; "I don't have anything." Trooper Archer stated that it was his belief that appellant consented to the search; he proceeded to search appellant's vehicle.

{¶ 23} Trooper Archer stated that he had difficulty getting the right front passenger door open. Once open, he discovered a fresh cut in the passenger side metal rocker panel. Archer stated that he pulled up the plastic where your feet are located on the passenger side and discovered a plastic package. Archer then read appellant her *Miranda* rights and placed her in custody. She was then transported to a highway patrol post.

{¶ 24} During cross-examination, Trooper Archer was questioned about the length of the detention. Archer stated he has his "aha moment" about nine minutes after appellant was initially stopped. Archer was also questioned about the "criminal indicators" he stated he observed and the fact that there were innocent explanations for them.

{¶ 25} Trooper Brian Holden testified extensively regarding the training, procedure and process of K-9 narcotic detection. He also discussed packaging and various tricks drug traffickers use to hide narcotics in vehicles to elude law enforcement. Holden testified that due to many variables, if his K-9 fails to provide a "trained final response" it does not mean that there are no controlled substances in the vehicle.

{¶ 26} On the date of appellant's arrest, Trooper Holden, less than two miles away, was called to walk his K-9 around appellant's vehicle; the dog did not give a

8.

"trained final response." At that point, it turned into a "consent to search" where Trooper Archer conducted the search and Trooper Holden remained in the patrol vehicle with appellant. Holden explained that it was Archer's stop so he conducted the search. Trooper Holden stated that he then took over Trooper Archer's role which included presenting the consent to search form. Holden stated that if appellant revoked consent at any time he would inform Trooper Archer.

{¶ 27} Trooper Holden testified that initially appellant deflected or avoided answering the question of whether she gave consent to Trooper Archer to search her vehicle. Holden stated that appellant was "trying to talk around it" and was "trying to justify her trip." Once in the vehicle with appellant, Trooper Holden gave her the consent form and asked her to read it; appellant indicated that she just wanted to sign it. Holden explained that the form was not necessary since she verbally gave her consent but that it is preferred because it includes an incident number and vehicle information. Trooper Holden stated that he then began filling out the warning slip for the traffic violation which would be given to her if the search proved fruitless.

{¶ 28} Trooper Holden testified that appellant's demeanor noticeably changed when Trooper Archer was standing near the location of the hidden compartment. Holden stated that appellant began voluntarily explaining to him that the door does not open and that she did not know why.

{¶ 29} While they were talking, Trooper Ryan Stuart and Agent Shaffer of the United States border patrol arrived. Trooper Holden believed that they just observed the

9.

stop and were offering assistance. The agents all began to focus on appellant's right wheel well. Trooper Holden indicated that appellant then began voluntarily explaining to him that her tire was flat likely due to a crash in Colorado. She further stated that she had proof of the accident via a form from a sheriff.

{¶ 30} Trooper Holden was asked, in general, about his encounter with appellant. He stated that he had been trying to build rapport with her, he was not aggressive with her or threatening, he did not brandish a weapon and he did not handcuff her. Holden stated that although appellant seemed uncomfortable she did not, at any point, attempt to revoke consent to search.

{¶ 31} Former OSHP Trooper Tony Martin testified that he is fluent in Spanish and that during his tenure with the OSHP he aided in translating Spanish to English and vice versa. Martin testified via Skype that he conducted an interview of appellant in Spanish at the Bowling Green, Ohio, OSHP post. The substance of his testimony was that appellant initially stated that she was threatened and forced to transport the narcotics across country by an unknown man. Appellant then admitted that she knew an individual involved in criminal activity and approached the person to see if she could make some money. She was promised $1,000 per kilo of narcotics. This individual had her register and insure the Acura in her name. Martin admitted that due to dialect differences there were times when he did not understand appellant and asked for clarification.

10.

{¶ 32} The state's final witness was Trooper Travis Rothenbuhler who also interviewed appellant at the Bowling Green OSHP post. The interview, conducted in English, was recorded and admitted into evidence.

{¶ 33} On December 31, 2018, the trial court entered its judgment denying appellant's motion to suppress. In its 32-page decision, the court concluded that Trooper Archer had probable cause to stop appellant based upon his observation of multiple traffic violations, he had reasonable and articulable suspicion that criminal activity was afoot, appellant consented to the search of her vehicle, and that appellant's right against self-incrimination was not violated during her interviews following her arrest. Appellant then entered no contest pleas and was sentenced on February 22, 2019. The sentences were journalized on February 26 and March 4, 2019. This appeal followed with appellant raising the following assignment of error for our review:

I. The trial court erred when it denied the defendant's motion to suppress.

{¶ 34} We initially note that appellate review of a trial court's denial of a motion to suppress presents mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). An appellate court defers to a trial court's factual findings made with respect to its ruling on a motion to suppress where the

11.

findings are supported by competent, credible evidence. *Id.*; *State v. Brooks*, 75 Ohio St.3d 148, 154, 661 N.E.2d 1030 (1996). "[T]he appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

**The Stop**

{¶ 35} "The Fourth Amendment guarantees 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Whren v. United States*, 517 U.S. 806, 809, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). We note that an investigatory traffic stop may only be legitimately effectuated when there is a reasonable and articulable suspicion of criminal activity. *State v. Swanson*, 6th Dist. Wood No. WD-05-065, 2006-Ohio-4798, ¶ 15.

{¶ 36} Appellant does not dispute the fact that Trooper Archer had sufficient cause to stop her vehicle based on traffic violations. Rather, appellant argues that "the officer did not have the right to detain defendant after the officer had completed all activity related to the original purpose of the stop." Although appellant does not focus on the circumstances surrounding the stop, we note that Trooper Archer was careful to base his stop on more than just driving slow in the center lane because this court has held that marginally driving under the posted speed limit in the center of three lanes on the turnpike, without impeding traffic, does not justify an investigative stop. *See State v. Clark*, 101 N.E.3d 758, 2018-Ohio-2029 (6th Dist.); *State v. Lu*, 6th Dist. Wood No.

12.

WD-18-040, 2018-Ohio-5009. Conversely, a stop following a motorist's crossing of a marked lane is justified, *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204; as well as the offense of following too closely, *State v. Meza*, 6th Dist. Lucas No. L-03-1223, 2005-Ohio-1221

**Reasonable Suspicion**

{¶ 37} Appellant argues that the criminal indicators testified to by Trooper Archer, even when viewed in totality, were not sufficient to warrant suspicion of criminal activity. Appellant contends that this is especially true given that the K-9 failed to alert to the presence of narcotics.

{¶ 38} "If during the initial detention * * * the officer ascertained reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual." *State v. Robinette*, 80 Ohio St.3d 234, 241, 685 N.E.2d 762 (1997). As the Supreme Court of Ohio held in *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, paragraph two of the syllabus, "[t]he 'reasonable and articulable' standard applied to a prolonged traffic stop encompasses the totality of the circumstances, and a court may not evaluate in isolation each articulated reason for the stop."

{¶ 39} A drug dog's failure to indicate the presence of narcotics is significant though it generally does not negate reasonable suspicion if supported by the remaining circumstances. *See State v. Raphael*, 12th Dist. Warren Nos. CA2014-11-138,

13.

CA2014-11-139, 2015-Ohio-3179, ¶ 26; *State v. Alexander*, 151 Ohio App.3d 590, 2003-Ohio-760, 784 N.E.2d 1225, ¶ 56 (8th Dist.); *State v. Clark*, 2d Dist. Montgomery No. 18314, 2000 WL 1643789 (Nov. 3, 2000). *See also State v. Edwards*, 891 F.3d 708, 712 (8th Cir.2018).

{¶ 40} As articulated above, Trooper Archer noted the following factors as criminal indicators which formed the basis of his initial and continued suspicion that appellant was involved in drug trafficking: Arizona license plates, solo travel along a pipeline route, a rosary around her neck, overly cooperative, uncertainty of her destination, vagueness about her uncle's condition, use of a car instead of flying in light of her stated short trip duration, newly purchased and registered vehicle, and uncertainty as to whether illegal drugs were in her car.

{¶ 41} Based on our review of the relevant case law and the record, though some of the "indicators" observed by Trooper Archer are less credible than others, we need not reach the issue of whether Archer had reasonable suspicion to prolong the stop based on our conclusion below relative to whether appellant consented to the search of her vehicle.

### Consent

{¶ 42} The constitutionality of a consent search turns on whether or not consent was given and then, whether or not that consent was voluntary. *State v. Mays*, 10th Dist. Franklin No. 09AP-942, 2010-Ohio-3289, ¶ 8-9, citing *State v. Lattimore*, 10th Dist. Franklin No. 03AP-467, 2003-Ohio-6829 and *United States v. Worley*, 193 F.3d 380 (6th Cir.1999). The state has the burden to demonstrate that consent to search was voluntarily

14.

given.  *State v. Grubbs*, 2017-Ohio-41, 80 N.E.3d 1075, ¶ 45 (6th Dist.), citing *State v. Oke*, 6th Dist. Wood Nos. WD-04-082, WD-04-083, 2005-Ohio-6525, ¶ 44.  The determination of whether a consent to a search was voluntary or was the product of duress or coercion, express or implied, "is a question of fact to be determined from the totality of the circumstances."  *Id.*, citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).  Accordingly, a trial court's decision regarding consent will not be overturned unless it is clearly erroneous.  *United States v. Bueno*, 21 F.3d 120, 126 (6th Cir.1994); *see also United States v. Ivy*, 165 F.3d 397, 401 (6th Cir.1998), *Worley*, 193 F.3d at 384 (6th Cir.1999)

{¶ 43} In its decision denying appellant's motion to suppress, the trial court recounts Trooper Archer's attempts to obtain appellant's consent to search her vehicle. The court indicated that Archer's first attempt met with no answer.  The next attempt met with: "I don't think so, I have nothing to hide."  At that point appellant became aware that Trooper Holden's K-9 failed to alert and the troopers switch positions.  Trooper Archer again asks for permission to search.  The court indicates that appellant failed to respond yes or no but notes the fact that the K-9 failed to find any narcotics.

{¶ 44} The court then relevantly states:

It appears at this point that Defendant stated that she is okay with the search, although the Court cannot clearly hear the words of acquiescence on the video.  It is clear, though, that Trp. Archer understood her to say that she was agreeable with the search.  Trp. Holden stated in his testimony that

Trp. Archer asked if Defendant had an issue searching the car and she said "no" and did so with a nod indicating consent.

The court then concluded that appellant consented to the search and held that based on the totality of the circumstances surrounding the consent it was voluntary.

{¶ 45} Independently reviewing the dashcam video of the stop, we note the following exchanges:

14:07:31:  Trooper Archer **first** asks appellant: Do you have any problem with us searching your car?  Nothing illegal you say, right?

Appellant:  No, nothing illegal

Archer:  All right.

Appellant:  I didn't do anything.

14:07:38:  **Second request**:  So you don't have any problem with us looking in your car then?  After no reponse Trooper Archer goes on to articulate the reasons for his suspicions stemming from his disbelief of appellant's stated reason for travel.

Appellant:  No, if I had something to hide I would say. * * * I don't have nothing to hide.

14:08:  **Third request**:  So you don't have any problem with us searching then?

Appellant:  I don't think so, because I don't have anything to hide.

16.

14:08:15: At this point Troopers Archer and Holden change positions so Archer can search the vehicle. Archer informs Holden where the warning and 24 hour consent-to-search forms are located. Appellant questions the fact that the dog failed to alert. Archer responds that sometimes dogs have bad days. He continues to express that he does not believe appellant's story.

14:09:07: **Fourth request**: You have no problem with me searching your car, right?

Appellant: The dog already went in there and didn't find anything. I mean if the dog didn't find anything I don't know what he did.

14:09.38: Appellant's trunk opens as Trooper Archer begins his search.

Trooper Holden then presents appellant with the consent form which she ultimately signs.

{¶ 46} Trooper Holden's testimony, as noted above, was relied upon by the trial court in finding that appellant consented prior to the start of the search. Such finding is not clearly supported. Trooper Holden stated during the suppression hearing:

I believe she nodded. At one point – although the audio in here is not great – I believe she goes along the lines of I believe Jason asked her do you have an issue with us searching the car, and she says, no, I don't think so. And in his report [Trooper Archer's] he does say there was a nod.

{¶ 47} As set forth above, in order to assess the constitutional validity of a search it must first be determined whether consent was, in fact, given. *Mays*, 10th Dist. Franklin No. 09AP-942, 2010-Ohio-3289. Consent to search may be inferred reviewing the totality of the circumstances in conjunction with nonverbal actions such as a nod or an inexact response. *Id.* at ¶ 7. However, when consent is not expressly given the burden on the state to show free and voluntary consent is even heavier. *Id.*, citing *State v. Holsinger*, 10th Dist. Franklin No. 00AP-216, 2000 WL 1483730 (Oct. 10, 2000). *See State v. Lane*, 2d Dist. Montgomery No. 21501, 2006-Ohio-6830, ¶ 39-40.

{¶ 48} Upon careful review of the testimony presented during the suppression hearing and the dashcam video, we find that the state failed to meet its burden to show that appellant gave consent to search her vehicle. Even assuming that appellant did nod her head affirmatively her words, which were recorded, belie the conclusion that she gave consent to search. Further, the after-the-fact signing of the consent form does not cure the constitutional deficiency. *See State v. Wildman*, 185 Ohio App.3d 346, 2009-Ohio-6986, 923 N.E.2d 1240, ¶ 21-23 (6th Dist.) (where there was a minimal time lapse and no intervening circumstances, a defendant's consent did not negate the unlawful police activity).

{¶ 49} Based on the foregoing, we find that the trial court's conclusion that appellant consented to the search of her vehicle was not supported by competent, credible evidence. Appellant's assignment of error is well-taken.

18.

**{¶ 50}** On consideration whereof, we find that appellant was prejudiced or prevented from having a fair proceeding and the judgments of February 26 and March 4, 2019, are reversed and the matter is remanded to the trial court for further proceedings consistent with this decision. Pursuant to App.R. 24, the state is ordered to pay the costs of this appeal.

Judgments reversed
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J. _____

Arlene Singer, J. _____

Christine E. Mayle, J. _____
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.